Randal S. Mashburn
U.S. Bankruptcy Judge

Dated: 5/24/2024

# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE

IN RE:                 )

                      )

530 DONELSON, LLC,       )      Case No. 3:24-bk-00879

                      )      Chapter 11

     Debtor.            )      Judge Randal S. Mashburn

## MEMORANDUM OPINION IN SUPPORT OF ORDER DENYING BHAVIN GHODOSARA'S MOTION TO DISMISS CHAPTER 11 BANKRUPTCY CASE

Bhavin Ghodosara, a member of debtor 530 Donelson, LLC, asks the Court to dismiss the Debtor's Chapter 11 bankruptcy pursuant to 11 U.S.C. § 1112(b)(1) based on alleged bad faith or, in the alternative, pursuant to § 305(a)(1) as being in the best interest of the Debtor and creditors.[1]  Because Mr. Ghodasara has not satisfied the Court that the bankruptcy was filed in bad faith or that the Debtor's and creditors' interests would be best served by dismissal, his motion is denied.

### FACTUAL AND PROCEDURAL BACKGROUND

Debtor 530 Donelson, LLC was formed in July 2018 for the purpose of purchasing and developing certain real property at 530 Donelson Pike in Nashville, Tennessee.  Its three members are Mr. Ghodasara, with a 10% membership interest, Eric Lowman with a 45% membership interest, and David Patterson with a 45%

---

[1] As part of his motion to dismiss, Mr. Ghodasara also asked the Court to dismiss the bankruptcy due to having been filed by one of the Debtor's managing members without appropriate authority because the Debtor was under a state court receivership.  The Court set that legal issue for hearing prior to addressing the factual dispute over bad faith.  The Court denied the motion to dismiss on authority grounds by separate order entered on April 25, 2024, at Doc. 74.

membership interest.[2]  Mr. Lowman and Mr. Patterson are the managing members of the LLC.

The Debtor's property is 9.11 acres with two building structures and a large parking area. One structure was formerly used as a K-Mart store, and the other structure contained a Ruby Tuesday restaurant and approximately eight other retail spaces. The structures and parking area pre-existed the Debtor's purchase of the property.  The Debtor has not yet adopted a development plan or otherwise begun development in earnest.

On April 22, 2022, Mr. Ghodasara filed suit against the other members, Mr. Lowman and Mr. Patterson, in the Circuit Court for Davidson County, Tennessee.  He sued on behalf of himself individually and the Debtor derivatively, asserting claims of breach of contract, breach of fiduciary duties, civil conspiracy, fraud, unjust enrichment, and declaratory judgment.  In connection with his suit, Mr. Ghodasara recorded a lien lis pendens against the Debtor's real property on March 21, 2023.

The state court entered several orders that Mr. Ghodasara characterizes as unfavorable to Mr. Lowman and Mr. Patterson (the state court defendants).  These include typical litigation orders such as: (i) orders relating to discovery; and (ii) orders relating to the parties' pleadings (e.g., order denying Mr. Ghodasara's motion for default judgment but requiring that defendants amend and supplement their answer and counterclaims; order denying defendants' motion to amend their answer to add a statute of limitation defense and order denying defendants' related motion to dismiss on statute of limitation grounds; and order dismissing defendants' counterclaims). Some of the orders granting Mr. Ghodasara's motions were simply unopposed by the defendants.

More substantively, the state court entered two similar orders prohibiting defendants from selling, encumbering, or leasing the Debtor's real property without

---

[2] This background fact is drawn from the Operating Agreement and the parties' stipulations, which were limited to the hearing on the motion to dismiss.  It is not intended as a finding of fact that would have any preclusive effect on the parties' pending litigation, which the Court understands to include a dispute over ownership percentages.

the approval of the state court. The court expressly permitted defendants to negotiate sales, encumbrances, and leases subject to court approval.

Additionally, in January 2024, the state court appointed a receiver over the Debtor and its property and ordered the receiver to investigate and recommend to the Court the "use of the property that will be most beneficial to 530 Donelson, LLC." (Order on Motion for Court-Appointed Receiver, Ex. 2017.) By separate order, the state court gave the receiver until late June to propose a plan for the use of the property and set a hearing on July 10, 2024, to discuss the receiver's plan.

While the state court litigation was pending, the Debtor's loan from FirstBank matured on July 16, 2023, with approximately $10,457,000 in principal due and outstanding. Each of the Debtor's members had guaranteed the FirstBank debt proportionate to their membership interests.

Pursuant to the loan terms, FirstBank could charge interest at the rate of 24% per annum after default. By agreement dated July 31, 2023, between FirstBank, the Debtor, Mr. Lowman and Mr. Patterson, FirstBank agreed to forbear from enforcing its note until January 16, 2024. This was FirstBank's first forbearance agreement. FirstBank also agreed to forbear from charging the default interest rate and limit interest to 8.5% per annum during the term of the first forbearance period. As of the end of the first forbearance period, the note remained unsatisfied, thus resulting in FirstBank again having the right to charge the default interest rate and exercise other default remedies.

Soon after the first forbearance agreement expired on January 16, 2024, FirstBank sought permission to intervene in the state court litigation and relief from the receivership stay to pursue foreclosure. After a hearing on February 28, 2024, the state court denied FirstBank's motions, reasoning that the receiver had not yet had sufficient time to propose a plan for the property. It appears from the orders that the state court contemplated reconsidering FirstBank's requests at or after the July 10, 2024, hearing to discuss the receiver's proposed plan.

On March 14, 2024, FirstBank entered into a second forbearance agreement with Mr. Lowman and Mr. Patterson as guarantors. According to the recitals in the

agreement, Mr. Lowman and Mr. Patterson were each liable under their guarantees for up to $4,995,000 of the Debtor's loan from FirstBank. Pursuant to the second forbearance agreement, FirstBank again agreed to forbear from enforcing the note and limit interest to 8.5% per annum for a short period of time until June 30, 2024, with certain conditions. Mr. Lowman and Mr. Patterson indicated their intent to file bankruptcy on behalf of the Debtor by March 15, 2024. FirstBank agreed to support the appointment of John McLemore (the receiver) and/or Gulam Zade (the receiver's business consultant/advisor) as custodian of the Debtor's property or chief restructuring advisor of the Debtor, and the parties agreed to seek approval from the bankruptcy court of adequate protection and cash collateral terms. Mr. Patterson promised that by March 20, 2024, he would enter into an agreement, subject to court approval, to purchase the Debtor's real property by June 30, 2024, in an amount sufficient to satisfy the FirstBank debt. The sale agreement was required to be all cash, with no contingencies.

Consistent with the terms of the second forbearance agreement, Mr. Lowman did sign and file a Chapter 11 petition on behalf of the Debtor on March 14, 2024. That same day, the Debtor filed a motion for Court approval of the Debtor's retention of Gulam Zade as chief restructuring advisor. In that motion, the Debtor included information about the state court's appointment of a receiver and stated:

> To ensure operational independence and avoid insider infighting during the pendency of this bankruptcy case, the Debtor wishes to retain an independent, third-party restructuring professional with operational and financial decision-making authority to act on behalf of the estate as its fiduciary. Such a request is supported by FirstBank, the senior secured lender and the largest creditor in this case.

(Doc. 4, ¶ 7.)

The next day, Mr. Lowman and Mr. Patterson removed the state court litigation to bankruptcy court. Mr. Ghodasara is seeking remand of the litigation back to state court, and his motion is pending.

On April 5, 2024, Mr. Ghodasara filed his motion to dismiss the Debtor's bankruptcy case and requested expedited consideration of his motion and a hearing

on April 16, 2024. The Court bifurcated the hearing on the motion to dismiss, first addressing a legal issue about Mr. Lowman's authority to file bankruptcy on behalf of the Debtor at a hearing on April 16, 2024, and reserving the factual disputes for an evidentiary hearing on May 13, 2024. By separate order entered on April 25, 2024, the Court denied Mr. Ghodasara's motion to dismiss on grounds of lack of authority. (Doc. 74.)

At the hearing on May 13, 2024, the Court heard testimony from Drew Smitherman, Senior Vice President with FirstBank; Mr. Lowman; Mr. Patterson; Mr. Ghodasara; and Mr. Zade. Additionally, the parties filed stipulations of fact and admitted into evidence multiple document exhibits. The Court also considered the parties' written legal arguments filed before the hearing and Mr. Ghodasara's supplemental legal authority submitted after the hearing.[3]

## DISCUSSION

Mr. Ghodasara asks the Court to dismiss the Debtor's bankruptcy case for cause under 11 U.S.C. § 1112(b)(1) due to the Debtor's alleged bad faith or under § 305(a)(1) as being in the best interests of the Debtor and its creditors. As to each claim, Mr. Ghodasara has the burden of proof by a preponderance of the evidence. *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013) (The party seeking dismissal under § 1112(b) carries the burden of proof and must satisfy that burden by a preponderance of the evidence.); *In re Dzierzawski*, 528 B.R. 397, 405

---

[3] On May 20, 2024, one week after the hearing and the close of evidence, Mr. Ghodasara filed a "Notice of Filing" and attached two documents he had referred to in his hearing testimony. (Doc. 113.) Mr. Ghodasara did not identify these documents on his exhibit list or submit them as potential exhibits ahead of the hearing, nor did he make any motion during the hearing to admit the documents as late-filed exhibits. He does not ask the Court for any relief in relation to the Notice of Filing, but it seems clear that he wants the Court to consider the documents as additional evidence. FirstBank has moved to strike the Notice of Filing, and Mr. Ghodasara has responded. (Docs. 114, 115.) FirstBank's motion to strike is granted since Mr. Ghodasara has presented no justification for consideration of the exhibits after proof has closed. Even if the Court did not grant the motion to strike the belated exhibits, they would have no impact on the Court's ruling on the motion to dismiss. To the extent the documents were otherwise allowed to be submitted for consideration, they are hearsay and inadmissible. Even if admitted, the Court finds that they would carry little or no weight beyond the testimony already given by Mr. Ghodasara on the issue of potential refinancing of the FirstBank debt, which the Court finds to be irrelevant to the question of the Debtor's good faith for the reasons stated in Discussion section I.A.i..

(Bankr. E.D. Mich. 2015) (Movant bears the burden of demonstrating by a preponderance of the evidence that the debtor and its creditors would benefit from dismissal or suspension of proceedings under § 305(a)(1).).

The Court will consider each claim for dismissal in turn.

## I.    Dismissal for Cause Under 11 U.S.C. § 1112(b)(1)

Section 1112(b)(1) of the Bankruptcy Code provides that upon request by a party in interest and a showing of "cause," the court "shall" convert or dismiss a Chapter 11 case, "whichever is in the best interests of creditors and the estate," unless the court determines that the appointment of a trustee or examiner is in the best interests of creditors and the estate.  In addition to the examples of cause included in § 1112(b)(4), a debtor's bad faith in filing the Chapter 11 case can provide cause for dismissal.  *Trident Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co.* (*In re Trident Assocs. Ltd. P'ship*), 52 F.3d 127, 130 (6th Cir. 1995).

"Good faith" is not a defined term.  The Sixth Circuit considers it an "amorphous notion, largely defined by factual inquiry."  *Laguna Assoc. Ltd P'ship v. Aetna Casualty and Surety Co.* (*In re Laguna Assoc. Ltd P'ship*), 30 F.3d 734, 738 (6th Cir. 1994) (quoting *In re Okoreeh–Baah*, 836 F.2d 1030, 1033 (6th Cir. 1988)); *cf. Indus. Ins. Servs., Inc. v. Zick* (*In re Zick*), 931 F.2d 1124, 1127 (6th Cir. 1991) (likening the examination of good faith in chapter 7 dismissal under § 707(a) to a "smell test").  There is no single test for good faith.  Instead, a "multitude of factors" may be relevant, and the Court must consider the totality of the circumstances presented in the case before it.  *Laguna*, 30 F.3d at 737-38; *see also Trident*, 52 F.3d at 131.

To assist courts, the Sixth Circuit has identified some factors that may be meaningful to the evaluation of good faith:

(1) the debtor has one asset;

(2) the pre-petition conduct of the debtor has been improper;

(3) there are only a few unsecured creditors;

(4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;

(5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;

(6) the filing of the petition effectively allows the debtor to evade court orders;

(7) the debtor has no ongoing business or employees; and

(8) the lack of possibility of reorganization.

*Trident*, 52 F.3d at 131 (quoting *Laguna*, 30 F.3d at 738).

In addition to the *Trident* or *Laguna* factors, courts have also looked to "whether the debtor has filed previous bankruptcy petitions; whether the debtor is generating any cash or income; whether there is pressure from non-moving creditors; whether the case is a two (2) party dispute which can be resolved in pending non-bankruptcy court litigation; and whether the debtor was formed immediately prior to the petition." *In re Four Wells Ltd.*, 2016 WL 1445393 at *11 (B.A.P. 6th Cir. April 12, 2016) (citing *Primestone Inv. Partners, L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners, L.P.)*, 272 B.R. 554, 557 (D. Del. 2002)).

Though the Sixth Circuit has identified some "indicia of bad faith," the Circuit cautions that "no list is exhaustive of all the conceivable factors which could be relevant when analyzing a particular debtor's good faith." *Laguna*, 30 F.3d at 738 (quoting *In re Caldwell*, 851 F.2d 852, 860 (6th Cir. 1988)) (additional citations omitted).

The Court has broad discretion in deciding whether dismissal is appropriate. *In re Lee*, 467 B.R. 906, 917 (B.A.P. 6th Cir. 2012). Ultimately, the Court does not simply tally factors, but it "must look at all the factors together and determine whether the petitioner sought to achieve objectives outside the legitimate scope of the bankruptcy laws when filing for protection under Chapter 11." *Four Wells Ltd.*, 2016 WL 1445393 at *14 (citations and internal quotation marks omitted). In other words,

for there to be a lack of good faith, the debtor must intend to obtain the benefits of bankruptcy for an improper purpose. *Id.* (citing 7 *Collier on Bankruptcy* ¶ 1112.07 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016)). Dismissal for lack of good faith "should be confined carefully" and limited to "those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence." *In re Charfoos*, 979 F.2d 390, 393 (6th Cir. 1992) (quoting *Zick*, 931 F.2d at 1129).

Some of the above factors are undisputed to be present in this case: there is only one asset, there are few unsecured creditors, and the business operations are limited. But those factors are frequently present in every single-asset real estate case. While this Court agrees that they are factors to be considered, they should seldom be controlling. Otherwise, there is no purpose in having a separate category of bankruptcy – single-asset real estate cases – in the Bankruptcy Code. *See Webb MTN, LLC v. Whaley (In re Webb MTN, LLC)*, No. 3:07-CV-437, 2008 WL 361402, at *4 (E.D. Tenn. Feb. 8, 2008) ("Mere filing by a business or individual in order to avoid foreclosure is, in and of itself, neither atypical nor extraordinary. Further, the Bankruptcy Code permits single asset real estate bankruptcies, *see, e.g.*, 11 U.S.C. § 362(d)(3), so the present single asset filing is not atypical or extraordinary on its face.").

Mr. Ghodasara must recognize this since his main focus at the hearing was on two of the *Trident* or *Laguna* factors: improper prepetition conduct and evasion of state court orders. The Court will discuss each of those factors, along with additional circumstances the Court finds to be meaningful considerations in this case.

### A.    Improper Prepetition Conduct

Although labeled "improper prepetition conduct" by Mr. Ghodasara, most of the proof he presented in this category really amounts to his disagreement with decisions made by the majority and managing LLC members, Mr. Lowman and Mr. Patterson. Repeatedly, he argued that the managing members could have or should

have made a different business decision. Indeed, most of Mr. Ghodasara's assertions amount to Mr. Lowman and Mr. Patterson not doing what Mr. Ghodasara would have preferred.

Notwithstanding these disagreements, the Court does not find the actions in question to have risen to the level of being "improper" for purposes of this good faith review. Even if a business decision is unwise or imprudent (not necessarily true with most of the actions involved here), that does not mean that such a decision is so improper as to support a finding of bad faith. In fact, most debtors would not be in bankruptcy if all their prepetition decisions were astute and sensible. The Court is more concerned with conduct "akin to fraud, misconduct or gross negligence." *Charfoos*, 979 F.2d at 393. And even when there has been questionable conduct, a bad faith finding would normally require a connection between the conduct and an effort "to achieve objectives outside the legitimate scope of the bankruptcy laws when filing for protection under Chapter 11." *Four Wells Ltd.*, 2016 WL 1445393 at *14.

### i. Dealings with FirstBank and the FirstBank Debt

One of the areas where Mr. Ghodasara strongly disagreed with the actions of Mr. Lowman and Mr. Patterson relates to dealings with FirstBank and the FirstBank debt. Mr. Ghodasara argues that Mr. Lowman and Mr. Patterson did not act diligently to refinance the FirstBank debt before it came due in July 2023. Mr. Lowman and Mr. Patterson both testified to reaching out to lenders sometime before and after the loan came due to see if there was any interest, but Mr. Ghodasara's lien lis pendens made refinancing a non-starter. The Court found their testimony to be credible, and to the extent they arguably should have started looking into refinancing earlier or more diligently, the Court does not find their delay to reflect on their good or bad faith when it came time to decide whether to file bankruptcy. After all, they were successful in first negotiating a six-month forbearance agreement that delayed the need for bankruptcy into 2024.

Mr. Ghodasara further argues that FirstBank had agreed to forbear from foreclosing and charging default interest in the past, so somehow Mr. Lowman and

Mr. Patterson should have forced that forbearance to continue indefinitely while the property was developed. FirstBank was under no obligation to continue to forbear enforcement of its repayment terms, so its refusal to do so or insistence on certain conditions as incentives for it to forbear cannot reflect on the good faith of Mr. Lowman and Mr. Patterson. Fundamentally, one of Mr. Ghodasara's contentions is that the managing members should have forced the secured lender not to play hardball in trying to collect its debt. Since the managing members have taken actions that so far have avoided foreclosure and imposition of a very high default rate of interest for nearly a year, this second-guessing by Mr. Ghodasara is particularly questionable and certainly does not rise to the level of supporting a bad faith finding.

In a similar vein, Mr. Ghodasara argues that he offered to purchase the note from FirstBank, but FirstBank declined. FirstBank's senior vice president in charge of the loan, Andrew Smitherman, testified that FirstBank would not sell to any single guarantor, because that would open the bank up to being sued by the other guarantors. FirstBank had no legal obligation to sell its note to Mr. Ghodasara, and the Court can understand why it would have been reluctant to do so for fear of becoming embroiled in litigation, especially given the fact that the guarantors were already litigating among themselves. Regardless of the wisdom of FirstBank's decision, there is no evidence in the record that the managing members had any input into or control over the decision. FirstBank's refusal to sell the note is therefore not relevant to an inquiry into *the Debtor's* prepetition conduct or whether *the Debtor* filed bankruptcy in good faith.

More relevant to the Debtor's good faith in filing bankruptcy is Mr. Ghodasara's argument that he presented refinancing terms to the managing members, but they took no action. His goal seemed to be to show that the managing members' assertion that they filed bankruptcy to deal with the FirstBank debt is a pretext for other bad faith reasons. However, his proof falls short.

Mr. Ghodasara testified that he had letters of intent from two institutions willing to lend money to allow for the purchase of the Debtor's property or the

refinance of the debt. However, he was not certain whether or when he shared his ability to refinance the debt with the managing members. He said he believed it was shared through counsel, but he did not know whether it was shared before or after the bankruptcy was filed. This evidence could only be relevant to the question of whether the Debtor filed bankruptcy in good faith if it was actually shared with the managing members before the bankruptcy filing and far enough in advance that it might have been seen as a reasonable alternative. Without proof of communication to the managing members and the timing of any such communication, evidence of Mr. Ghodasara's purported ability to refinance the debt is not relevant to the Debtor's good faith in filing bankruptcy.

Even if that information was in evidence, the fact that Mr. Ghodasara may have presented an alternative to bankruptcy does not automatically render the managing members' choice of bankruptcy to have been in bad faith. As the Court has made clear, for a bankruptcy to be filed in good faith, it is not necessary that the debtor first explore every possible alternative and use bankruptcy only if there is no other viable option. Bankruptcy is often a last resort, but it is not a requirement of good faith that a debtor choose that path only after every other possibility has been considered and found to be unavailable.

### ii. Capital Calls

Another area of concern for Mr. Ghodasara related to capital calls. In the past, the Debtor often used capital calls to fund the accruing interest and other payments relating to the FirstBank debt. Mr. Ghodasara argues that Mr. Patterson and Mr. Lowman could have issued a capital call in July 2023 to pay some or all of the defaulted FirstBank debt, and that he had requested they do so.

Mr. Patterson does not dispute that Mr. Ghodasara made the request, that he and Mr. Lowman had the discretion and authority under the operating agreement to issue a capital call, and that he declined to do so. There is no argument that a capital call was non-obligatory and fully discretionary. The proof also established that the refusal to issue a capital call to satisfy the significant FirstBank debt was reasonable.

In fact, a capital call to satisfy the principal as compared to accruing interest would have been extraordinary and burdensome to the members.

The only certain way to make the debt problem go away through the capital call process would have been to issue a capital call for the full amount. Under the operating agreement, each member would pay a pro rata share of a capital call based on their membership interest. Since the debt was more than $10 million and Mr. Lowman and Mr. Patterson each had a 45% membership share, each of them would have had to fund approximately $4,500,000. Simply based on the amount of capital required, the Court does not find it unreasonable or improper that they did not choose to use the capital call process to solve the problem of the maturing FirstBank debt. But the evidence also showed that Mr. Lowman did not have the ability to fund that amount, and Mr. Patterson would have had to liquate assets to do so.

Mr. Ghodasara argued that they could have worked around Mr. Lowman's inability to fund his share. Under the operating agreement, if any member could not pay his full share and another member paid the shortfall, the nonpaying member's capital share would be diminished and the paying member's share increased. Mr. Ghodasara testified that he had suggested to Mr. Patterson that he and/or Mr. Patterson could cover Mr. Lowman's share. Mr. Patterson recalled that conversation with Mr. Ghodasara, but he testified that regardless of Mr. Lowman's financial wherewithal, he would not have made the capital call because he would have had to liquidate assets even to cover his share. Additionally, if Mr. Patterson and Mr. Ghodasara could have paid their own and Mr. Lowman's share of a capital call, it would have resulted in a change in the ownership structure. Using the example of Mr. Ghodasara funding Mr. Lowman's share, it could have significantly increased Mr. Ghodasara's ownership interest and conversely diminished Mr. Lowman's ownership interest.

The Court does not find it to be bad faith for the managing members to decline to exercise their discretion to make a capital that would have required them to fund

millions of dollars from personal assets and/or potentially significantly change the ownership structure of the LLC.

Mr. Ghodasara also seemed to believe that there should have been some way to use the capital call process to pay some portion of the debt without necessarily having to fund a payoff of the full amount of the debt. However, that is purely speculation. There is no proof that the Bank would have agreed to any long-term extension of the maturity of the loan by a partial paydown. In fact, all the proof was quite to the contrary – that FirstBank wanted this loan completely off its books, and the sooner the better.

Mr. Ghodasara's argument relating to the capital call issue also requires an assumption that a capital call decision made in mid-2023 is relevant to a decision to file bankruptcy in March 2024. The Court allowed the evidence to be presented since it is hard to define, prior to hearing all the proof, when prepetition conduct becomes relevant. But ultimately, the proof was that Mr. Lowman and Mr. Patterson first considered bankruptcy in late February or early March 2024. Not only is the evidence regarding the requested capital call not indicative of improper behavior or decision-making, but the Court finds it to be only nominally relevant to the good faith analysis and accords it little, if any, weight.

The capital call argument by Mr. Ghodasara is just another example of Mr. Ghodasara attempting to convert a disagreement with a judgment call made by the managing members into a basis for a finding of bad faith in filing bankruptcy. It reflects a pattern in Mr. Ghodasara's Court filings and evidence presentation that Mr. Ghodasara believes that a failure to avoid bankruptcy by using other possible methods to deal with the FirstBank debt demonstrates that the bankruptcy filing was done in bad faith. That is not the test. It is not incumbent on a debtor to avoid filing bankruptcy at all costs to avert a finding of bad faith.

### iii.     Failure to Develop the Property

Mr. Ghodasara likewise contends that a failure of the managing members to develop the Debtor's property somehow demonstrates bad faith in the bankruptcy filing.  It is undisputed that the Debtor was formed in July 2018 to purchase and develop the 530 Donelson property.  Mr. Ghodasara complains that the property remains undeveloped more than five years later.  This complaint goes to the heart of his suit against Mr. Lowman and Mr. Patterson in state court.  As for the hearing on the Debtor's good faith or lack thereof in filing bankruptcy, Mr. Ghodasara presented evidence that the property is impacted by a reciprocal easement with two adjoining properties related to the shared use of parking lots.  The easement predated the Debtor's formation and purchase of the 530 Donelson property by more than 20 years.

Mr. Patterson owns one of the adjoining properties, and he and Mr. Lowman own the business that operates on that property.  That business uses the 530 Donelson property for overflow parking.[4]  Mr. Ghodasara complains that Mr. Patterson was aware of and failed to disclose the reciprocal easement to him prior to Mr. Ghodasara entering into the 530 Donelson partnership.  The responsive argument was that the easement would have been a matter of public record.  In any event, that argument over an allegedly wrongful omission by Mr. Patterson when the LLC was originally created does not factor into whether a bankruptcy filed years later was filed in good faith.  Mr. Ghodasara has not shown it to have been part of a continuing pattern of misconduct, but instead it is an isolated incident that predated the bankruptcy filing by five years.

Mr. Ghodasara also argues that the easement was an impediment to development of the 530 Donelson property because it limited development to the

---

[4] Mr. Ghodasara complains that Mr. Patterson and Mr. Lowman acted improperly by allowing their other business to use the Debtor's property for overflow parking for years without paying rent.  The Court understands their responsive argument to be that the use was permitted by the easement.  The Court makes no finding as to the propriety of FlightPark's use of the Debtor's parking areas rent free. Even assuming such use was improper, the Court would not find it to change the balance of the evidence and the Court's conclusion that Mr. Ghodasara has not met his burden of proving the bankruptcy filing to have been in bad faith.

footprint of the existing buildings on the property, and Mr. Patterson could and should have caused the easement to be released to allow development of the entire property. The Court first finds these arguments about the easement to be irrelevant to the determination of whether the Debtor filed bankruptcy in good or bad faith.

Secondly, whether Mr. Patterson could have obtained a release of the easement by all three property owners is entirely speculative. Mr. Patterson only had an ownership interest in two of the parcels: he owns one outright and the 530 Donelson property through his ownership interest in the Debtor. The third is owned by an unrelated third party or parties over whom he was not shown to have had any influence.

Third, Mr. Patterson's refusal to act to the detriment of one of his properties/businesses to benefit his other property/business (and to benefit Mr. Ghodasara as a minority member of Debtor), is neither surprising nor improper. The Court has indicated that a debtor is not required to take every possible step to stay out of bankruptcy in order to avoid a finding of bad faith. It is equally true that an individual owner of a debtor does not have to make personal sacrifices to keep a debtor from needing to file bankruptcy just to dodge being accused of acting in bad faith.

To the extent there is any legitimate argument among the three members about the easement, it is a matter for their ongoing litigation, not something that bears on the bad faith issue.

### iv.    Lack of Notice to Mr. Ghodasara of Bankruptcy

In addition to the "alternative choice" arguments, Mr. Ghodasara argues that Mr. Lowman and Mr. Patterson acted improperly by filing bankruptcy without first providing him with notice. First, Mr. Ghodasara did not show that notice was required. He pointed to § 11.01 of the Operating Agreement as requiring notice, but bankruptcy is not expressly stated to be an action requiring prior notice. For

purposes of the good faith issue, the Court will not infer additional notice requirements not explicitly stated in the Operating Agreement. (*See* Ex. 5002.)

More to the point on the bad faith question, Mr. Ghodasara argues that Mr. Patterson and Mr. Lowman did not provide him with notice before they filed bankruptcy for the Debtor because they must have known he would go to the state court to try to stop the bankruptcy based on the prior appointment of the receiver. This argument is not convincing because the receiver was well aware of the bankruptcy and it appears from Mr. Zade's testimony that the receiver likely would have given the state court his opinion that the Debtor's management, not the receiver, had the authority to file bankruptcy.

The Court finds it persuasive that the receiver himself had considered bankruptcy as an option for the Debtor. Mr. Zade testified that he and the receiver had considered filing bankruptcy on behalf of the Debtor to stay any foreclosure action by FirstBank. He stated they were also concerned that the default interest would be "overwhelming" to the Debtor.

In the receiver's consideration of bankruptcy, the receiver and his advisor questioned whether the receiver had the authority to file bankruptcy on behalf of the Debtor. After researching the issue, they concluded that the authority remained with the Debtor's managing members. Mr. Zade further testified to having a telephonic discussion on February 28, 2024, with counsel for Mr. Patterson and Mr. Lowman and counsel for FirstBank. During that call, Mr. Zade was asked for the receiver's position as to the Debtor filing bankruptcy, and he shared his and the receiver's belief that the managing members retained the power to file bankruptcy.

Thus, the receiver himself had considered bankruptcy as an option for the Debtor prior to determining that any decision as to bankruptcy was out of his hands. He was also well aware of the plan by the managing members to file bankruptcy several days before it occurred, and he saw no basis to try to stop it. There is no evidence to support the idea that this was an effort by the managing members or FirstBank to pull one over on the receiver. The managing members had nothing to

fear from the receiver learning of the bankruptcy or how the state court would rule on the authority issue, given the receiver's position on the matter. Therefore, the Court is not convinced that the managing members improperly failed to give Mr. Ghodasara notice of the bankruptcy to avoid state court action.

### B. Evasion of State Court Orders

Another factor courts consider in determining whether a Chapter 11 bankruptcy was filed in bad faith is whether the bankruptcy effectively allows the Debtor to evade court orders, and Mr. Ghodasara argues this factor applies. He entered into evidence several orders from the state court, described above, that include what he characterizes as "unfavorable" rulings against Mr. Lowman and Mr. Patterson, the state court defendants. Mr. Ghodasara argues that Mr. Lowman and Mr. Patterson filed bankruptcy to avoid orders actually entered by the state court and to avoid a potential award down the line of specific performance requiring development of the property. For several reasons, the Court is not persuaded that evasion of court orders served as a motivating factor for the bankruptcy filing.

The state court's orders restraining the defendants from selling, encumbering or leasing the property without court approval were intended to maintain the status quo during the parties' litigation about the property and cannot be interpreted as an indication of how the state court would rule and what relief would be granted after discovery and trial. Additionally, the effects of these state court orders and the bankruptcy filing are much the same: the managing members cannot sell or encumber the property *without court approval*, whether they are in state court or bankruptcy court.

Additionally, the dismissal of the managing members' counterclaims against Mr. Ghodasara does not presage a favorable ruling on the merits of Mr. Ghodasara's claims against them, nor does the state court's attitude toward the managing members. The state court's admonishments to the managing members about their conduct in discovery and the appointment of a receiver may show the state court's

frustration with and even distrust of the managing members' conduct, but this Court does not interpret those rulings as a bias in favor of Mr. Ghodasara as to the merits of his claims. This Court is confident that the state court would rule on the merits impartially and that no particular relief was certain to be granted.

At the heart of Mr. Ghodasara's complaint is his belief that because he had received some favorable rulings from the state court, he thought he would get the equitable relief he sought. He is of the view that the state court would somehow force the property to be developed through an award of specific performance of an alleged obligation of the Debtor to do so. And Mr. Ghodasara likewise seems convinced that he loses the possibility of development of the property through the bankruptcy process. He is wrong on both points.

As for the state court proceedings, the weight of the evidence leads the Court to conclude that an award of specific performance by the state court was highly speculative at the time of the bankruptcy filing and not a motivating factor. There is no evidence in the record that a trial on the merits was imminent. Further, not only do the court's prior "unfavorable" orders not lend support to a finding that the state court was likely to award specific performance, but other evidence – as well as common sense – weighs against the likelihood of such a finding.

The biggest impediment is the very fact that the three members of the Debtor LLC are involved in contentious litigation. Mr. Ghodasara never explains who he thinks would develop the property in the midst of long-term litigation in which the adverse parties distrust each other and disagree on just about everything, or how such development would be funded.

Moreover, the state court's appointment of a receiver over the Debtor and its property makes mandatory development as a form of litigation relief even less likely. Mr. Ghodasara argues that the state court ordered the receiver to consider the highest and best use of the property and report back to the court in July of this year, and he believes the property would fetch a higher value if developed rather than sold as is. Therefore, according to his logic, it follows that the receiver would recommend

development rather than a sale of the property. But this thought process ignores reality.

While the property has existing parking lots and buildings, the Debtor's intent was to redevelop the property into a much more commercially viable and profitable project. The Debtor has not yet adopted – much less implemented – any development plan. While a receiver might oversee the completion of a development project already well underway at the time the receiver is appointed, the Court finds it highly unlikely that a receiver would undertake commercial development from start to finish. At a minimum, this would entail (i) forming a plan for developing the commercial property that worked around or otherwise dealt with the reciprocal easement that Mr. Ghodasara testified made development of the property difficult; (ii) refinancing the defaulted FirstBank debt and obligating the debtor to millions of dollars of additional financing for the development; and (iii) overseeing a lengthy development process – all in hopes that the property would be worth more after development. The financing alone seems an impediment to specific performance of a development in receivership. The existing loan required personal guarantees and additional collateral. How a receiver could duplicate that situation to obtain reasonable financing is a mystery, and no proof was introduced on that point.

Accordingly, the Court finds it more likely that a receiver would report how to maximize the sale value of the property in its present condition. This seems especially true when, depending on the amount of interest that would accrue on the FirstBank debt prior to the sale of the property, it is undisputed that the property should sell for a sufficient amount in its current condition to pay all creditors. Whether the issue is before a state court or a bankruptcy court, it is unlikely that Mr. Ghodasara would obtain an order mandating that payment to creditors be deferred indefinitely to enhance the possibility that the owners might make a bigger profit down the road.

We also know from the testimony that the Debtor's receiver was already considering sale of the property prior to the bankruptcy filing, and Mr. Ghodasara,

Mr. Lowman and Mr. Patterson were all aware of that fact. Mr. Zade testified that the receiver had obtained and considered offers to purchase the property from Mr. Ghodasara and another party. He also testified that he and the receiver had been working toward an agreement among all parties about sale of the property, but they were not successful.

For all these reasons, a state court-ordered requirement that a receiver undertake expensive, lengthy, and risky development of the project is not a foregone conclusion. In fact, it is likely a longshot at best. Therefore, the Court does not accept Mr. Ghodasara's contention that fear of the state court mandating specific performance and ruling out a sale was a driving force for the bankruptcy filing. The possibility of an award of specific performance pales in comparison to the near certainty that any equity in the property would be wiped out over a relatively short period of time by the extremely high default interest rate that FirstBank may impose if there is not a prompt sale.

It is ironic that, although Mr. Ghodasara insists he wants the Debtor to develop the property, he is willing for the property to be sold, even within receivership, so long as it is sold to him. He testified to having made a couple of offers to the receiver for the purchase of the property. Apparently, he feels that an intention to sell the property through a court-approved bankruptcy process reflects bad faith by the managing members, but that bad faith dissipates if the property is sold to one specific buyer – Mr. Ghodasara. Not only is that argument self-serving, and not indicative of bad faith by the Debtor, but bankruptcy does not harm Mr. Ghodasara's potential to purchase the property. He is as free to bid on the property in bankruptcy as he is outside of bankruptcy.

Finally, the only actual order that bankruptcy served to "evade" is the order appointing a receiver. However, the evidence showed that Mr. Lowman and Mr. Patterson did not file bankruptcy as a means of regaining control over the debtor. Immediately upon filing bankruptcy, the Debtor sought to have the receiver's consultant, Mr. Zade, appointed as restructuring advisor to exercise operational

control over the Debtor. The consent to Mr. Zade's authority to act on behalf of the Debtor within bankruptcy does not reflect an intent to evade the receiver. When Mr. Ghodasara objected to Mr. Zade serving in that role in bankruptcy, the Debtor and the managing members quickly agreed to another restructuring advisor being put in place. So from the beginning of the bankruptcy, the managing members have been willing to relinquish the primary role in managing the bankruptcy proceedings and any sale process.

Additionally, as explained above, a sale of the property within the receivership was a potential and perhaps likely outcome in state court. Rather than being motivated to avoid the receivership, the Court finds it far more convincing that Mr. Lowman and Mr. Patterson were motivated by the advantages of sale within bankruptcy, which is not wrongful conduct.

One final point must be made regarding the allegation that the bankruptcy process is being used to circumvent adverse rulings in state court. The bankruptcy process as it has been discussed by counsel for the managing members and FirstBank is a tool for disposition of the property. Totally independent of whatever process is used to address the debt problems tied to the real estate is a complex and extremely adversarial piece of state court litigation affecting the three members of the LLC individually.

The state court litigation has been removed to bankruptcy court because the Debtor contends it was necessary to avoid any contradictory rulings in the initial stages of the bankruptcy while any sale effort is pursued. That is understandable, but there is no assurance that the underlying litigation will stay in bankruptcy court, especially after it is determined how matters will proceed regarding the real estate. The various claims among the members could linger in some court for a long time.

There is already a motion to remand the litigation back to state court, and this Court is not inclined to oversee the fight among the members except to the extent it involves an efficient method of addressing the real estate and debt problem. In short, there is no evidence to support the idea that the bankruptcy filing was "forum

shopping" to get the underlying state law claims among the members out of state court. And it would have been unreasonable for anyone to think such an effort would succeed since the remand decision will be addressed totally independent of the real estate disposition issues.

### C. Additional Circumstances

Although not listed among the Sixth Circuit *Trident* factors, the Court weighs heavily the fact that there was a significant financial advantage to the Debtor and the guarantors (including Mr. Ghodasara) with filing bankruptcy, and Mr. Lowman and Mr. Patterson appear to have filed bankruptcy for the advantages it may provide, not to avoid any disadvantage specifically related to the state court proceeding.

### i. Avoidance of Default Interest

Completely independent of what was happening in state court with the appointment of a receiver, FirstBank's first forbearance agreement expired January 16, 2024, shortly after the receiver was appointed on January 4, 2024. Mr. Smitherman with FirstBank testified that FirstBank considered the 530 Donelson debt to be a problem loan at that point and that it wanted to be paid as quickly as possible.

With the expiration of the first forbearance agreement, FirstBank could charge the Debtor default interest of 24 percent per annum, whereas the Debtor had been paying 8.5 percent per annum during forbearance. With more than $10,000,000 in principal, the increased interest rate has a substantial, negative effect. The difference between the default rate and forbearance rate of interest equates to roughly $140,000 per month.

Mr. Lowman and Mr. Patterson reasonably desired to avoid the increased cost of default interest to the Debtor and to themselves (and, incidentally, to Mr. Ghodasara) as guarantors. They both testified that was their sole reason for filing bankruptcy. As guarantors, they agreed to a second forbearance agreement with FirstBank dated March 14, 2024, pursuant to which FirstBank agreed to the reduced

rate of 8.5% per annum during the second forbearance period which would end June 30, 2024, barring the occurrence of an earlier termination event. The difference between the default rate and forbearance rate of interest equates to approximately $490,000 during the relatively short forbearance period.

The second forbearance agreement was structured around Mr. Lowman and Mr. Patterson filing bankruptcy on behalf of the Debtor by March 15, 2024; the agreed pursuit of the appointment of Mr. McLemore and/or Mr. Zade as custodian of the property and/or chief restructuring officer of the Debtor; and that the property be sold in an amount sufficient to satisfy the FirstBank debt by June 30, 2024. Additionally, the agreement required that "[o]n or before March 22, 2024, Mr. Patterson will enter into an agreement, subject to any applicable court approval, obligating Mr. Patterson to purchase the Property on or before June 30, 2024[.]" (Ex. 1004.) Mr. Smitherman testified that this provision was intended as an agreement by Mr. Patterson to present a stalking horse bid, and while it does not contain the words "stalking horse," the agreement terms lend themselves to that interpretation.

Avoiding an interest rate that would add nearly $140,000 to the debt every month is a big motivator. Faced with the imminent action of FirstBank to impose the default rate, the managing members could foresee the Debtor's equity in the property about to be reduced dramatically and their own personal exposure on their guarantees increasing. Thus, the Court finds the testimony of Mr. Lowman and Mr. Patterson quite credible that they were motivated to file bankruptcy by the desire to avoid the default interest rate.

Although they may have been under intense pressure, it was not unreasonable or improper for Mr. Lowman or Mr. Patterson to agree to bankruptcy and to pursue a swift § 363 sale process to pay off the FirstBank debt and avoid the accrual and liability for default interest. Both Mr. Lowman and Mr. Patterson testified that they had tried but could not find any lender interested in refinancing the FirstBank debt with the ongoing litigation among the Debtor's members and Mr. Ghodasara's lien lis

pendens, so swift refinancing was not considered a viable alternative to filing bankruptcy and selling the property pursuant to the forbearance agreement.

To the extent the second forbearance agreement expires prior to the property being sold and FirstBank being paid off, it is incumbent on the Debtor to sell the property as soon as possible to minimize the impact of default interest. The Debtor can proceed more quickly with a sale process in bankruptcy than in the state court receivership under the current timing, and sale within bankruptcy may improve bidding because the Bankruptcy Code in § 363(f) allows for sale free and clear of interests. This desire to obtain the benefits of bankruptcy both from the Bankruptcy Code and in concessions from the secured creditor is a legitimate basis for filing bankruptcy, and it is not rendered into a bad faith decision simply because it has the effect of avoiding a state court receivership.

### ii. Pressure from Secured Lender

Mr. Ghodasara has also made assertions that the manner in which FirstBank acted, the forbearance process used, and the pressure placed on the managing members reflects on the bad faith issue. Although Mr. Ghodasara never quite explains his theory, it seems to be a contention that FirstBank was acting in bad faith in dealing with the Debtor and that bad faith somehow rubbed off on the Debtor. Or perhaps the theory is that somehow the managing members utilized FirstBank's pressure on the Debtor to benefit themselves individually by forcing a sale that Mr. Ghodasara opposed.

The level of micromanaging imposed by FirstBank as conditions to forbearance – the requirement of bankruptcy, identifying a restructuring advisor, deadlines for filing bankruptcy and making a stalking horse bid, etc. – may be greater than some lenders would undertake. However, there has been no proof presented or law cited that would indicate that FirstBank's actions violated any particular statute, regulation, or legal standard. This is not a lender liability lawsuit, and FirstBank is not a defendant in any current litigation over this property. Mr. Ghodasara's attempt to paint FirstBank as a wrongdoer and then blending the lender's actions and the

managing members' actions into some type of concerted bad faith may or may not be clever, but it is not convincing.

The Debtor and guarantors accepted the default interest rate term when they originally sought out and accepted the loan from FirstBank. Years later, FirstBank's use of the concession of not charging the default rate to incentivize Mr. Lowman and Mr. Patterson to file bankruptcy and move for a swift sale of the property and satisfaction of the FirstBank debt is understandable. And, regardless of one's view of FirstBank's pressure tactics, the Debtor's quite logical response to that pressure is not proof of bad faith.

Because there can be a significant financial advantage in filing bankruptcy, the Court cannot conclude that FirstBank's influence caused the filing to have been in bad faith. The existence of one or more "factors" in the bad faith analysis does not necessarily mean that they are relevant to the good or bad faith of the Debtor. *See In re Lady Bug Corp.*, 500 B.R. 556, 563 (Bankr. E.D. Tenn. 2013) (citing *In re Webb MTN, LLC*, No. 3:07-CV-437, 2008 WL 361402, at *3 (E.D. Tenn. Feb. 8, 2008)) ("First, the court must note the presence of the factors, but second, and crucially, the court must also determine whether their presence is relevant to the actual bad faith of the particular debtor before the court.").

### iii. Legitimate Bankruptcy Purpose

The Court finds there to be a legitimate bankruptcy purpose to be served in this case. As discussed above, pursuing sale of the property seems ultimately to be the likely course of action whether in state court or bankruptcy court, but § 363 of the Bankruptcy Code allows the Debtor to sell the property free and clear of others' interests, including Mr. Ghodasara's lien lis pendens which may otherwise suppress bidding on the property and the sale price. Mr. Ghodasara would not necessarily lose his lien by virtue of a sale under § 363(f) in bankruptcy. Liens typically attach to sale proceeds to the same extent and priority as they had to the asset being sold. *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 259 (3d Cir. 2000) ("[A]ny interest in property that can be reduced to a money satisfaction constitutes a

claim for purposes of section 363(f) and, therefore, attaches to the proceeds of the sale."); *In re Burd*, 202 B.R. 590, 594 (Bankr. N.D. Ohio 1996) (quoting Norton Bankruptcy Rules Pamphlet, Editor's Comment to Fed.R.Bankr.P. 6004(c), at p. 360 (1995–96 ed.) ("[A] sale of the property of the estate free and clear of liens does not impair, divest, void, cancel or destroy any liens or interests, but merely transfers liens or the interests attached to particular property to liquidated proceeds of the sale.").

As for efficiency and expense, the Debtor may proceed more quickly with pursuing court approval of a sale in bankruptcy court than under the timing currently in place in the state court proceedings. The state court will not hear the receiver's recommendation until July 10, 2024. If the receiver were to recommend sale, any action toward sale could only begin after that point. Mr. Ghodasara's rights are the same. In either state court or bankruptcy, Mr. Ghodasara has the right to oppose sale, if proposed, bid to purchase the property, or propose another plan for the property.

With FirstBank's temporary waiver of default interest conditioned on the Debtor filing bankruptcy and promptly seeking to sell the property and pay the FirstBank debt, the Debtor saves a significant amount in interest that it otherwise would incur. Every day the Debtor moves closer to sale of the property and satisfaction of the FirstBank debt provides an economic advantage to the Debtor, whether through waiver of default interest by FirstBank or, if the default interest resumes, then by minimizing the time the Debtor is liable for it.

### D. Conclusion Regarding § 1112(b)(1)

The Court finds that, based on the totality of the circumstances, Mr. Ghodasara has failed to meet his burden of proof that the Debtor filed bankruptcy in bad faith. No one factor stood out as an indication of bad faith, nor did the facts and circumstances of this case taken together paint a picture of bad faith.

The existence of some of the *Trident* or *Laguna* factors does not compel the conclusion that the bankruptcy was filed in bad faith. "*Laguna* requires an inquiry

more nuanced than a surface-level tallying of factors." *In re Lady Bug Corp.*, 500 B.R. 556, 563 (Bankr. E.D. Tenn. 2013).

When the bankruptcy process – not just the mere filing – provides significant financial advantages to both the Debtor and creditors, it may weigh heavily in favor of bankruptcy being a good faith filing. *See, e.g., id.* at 562-64 (Notwithstanding the presence of some of the *Laguna* factors, "the strong possibility that this debtor could use its position as trustee to pay this creditor in full" and the "potential [in bankruptcy] to generate equity worth several times more than the debt" distinguished the case from *Laguna* and weighed heavily against a finding of bad faith).

The Court finds that the Debtor filed bankruptcy for the legitimate purpose of seeking to liquidate the property within Chapter 11, satisfying its primary, secured debt, and minimizing the accrual of default interest. It's too early to know whether the Debtor can accomplish those goals, and there may be further fights between the managing members and Mr. Ghodasara over the attempts to take advantage of the tools available in bankruptcy. But the proof did not support Mr. Ghodasara's contention that the mere effort to utilize bankruptcy to pursue those goals reflected an improper purpose.

The motion to dismiss under 11 U.S.C. § 1112(b)(1) is denied.

## II. Dismissal Pursuant to 11 U.S.C. § 305(a)(1)

Should the Court decide not to dismiss the bankruptcy case for cause under § 1112(b)(1), Mr. Ghodasara argues the Court should dismiss it pursuant to § 305(a)(1), which provides that the court "may" dismiss a bankruptcy case or suspend all proceedings if "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1). This is not a balancing test; both creditors and debtor must benefit from dismissal. *In re Dzierzawski*, 528 B.R. 397, 405 (Bankr. E.D. Mich. 2015). Dismissal under § 305(a) is an extraordinary remedy. *Id.*; *In re Vega*, No. 18-00295 BKT, 2019 WL 4896938, at *1 (Bankr. D.P.R.

Oct. 3, 2019) ("[S]uspension under Section 305(a)(1) of the Bankruptcy Code is an extraordinary remedy that should be used sparingly."). Once again, Mr. Ghodasara bears the burden of proof. *In re Dzierzawski*, 528 B.R. at 405.

As with dismissal under § 1112(b), dismissal under § 305(a) is determined on a case-by-case basis. *In re Efron*, 535 B.R. 505, 510 (Bankr. D.P.R. 2014), aff'd, 529 B.R. 396 (B.A.P. 1st Cir. 2015). Typically, when § 305(a) is invoked, the case is considered better suited to another forum. Some factors courts have considered include: (1) an absence of a bankruptcy purpose, (2) there is a pending state law proceeding, (3) another forum is better suited to hear the case, (4) efficiency and economy of administration, and (5) the case is a two-party dispute. *Id.* at 511; *see also In re Dzierzawski*, 528 B.R. at 405-406 (identifying similar factors considered by courts).

Mr. Ghodasara argues that the state court already has a process underway to determine the best use for the Debtor's property, and the state court proceedings have been going on for two years so they should remain with the state court. He argues that dismissal and allowing the state court to determine what happens with the property will be less expensive, but he offered no evidence on that point.

The Court considers disposition of the Debtor's property to be distinct from the members' litigation among themselves. The fact that the state court has been involved with the members' litigation for two years might factor more strongly in the Court's consideration of Mr. Ghodasara's motion for remand.

Ultimately, the Court looks at the best interests of the Debtor and creditors. While Mr. Ghodasara prefers to remain in state court, he has not presented any evidence to support that the Debtor's and creditors' interests are best served in state court. To the contrary, FirstBank clearly prefers to be in bankruptcy court and has argued strongly against dismissal. The Debtor also benefits economically from remaining in bankruptcy due to FirstBank's waiver of default interest and due to the potential for a more expedient sale process with the benefit of a sale free and clear of interests under § 363 of the Bankruptcy Code.

Dismissal under § 305 is extraordinary, discretionary relief, which Mr. Ghodasara has not convinced the Court is warranted. His motion to dismiss pursuant to § 305(a)(1) is denied.

### III.  Conclusion

For the reasons stated, Mr. Ghodasara's motion to dismiss is denied. A separate order will be entered.

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.